**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTINA PRESLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:10-cv-821-MEF-TFM |
| vs. | ) | (WO—Do not publish) |
| | ) | |
| CITY OF PHENIX CITY, | ) | |
| WILLIAM C.  LEWIS, and | ) | |
| RAYMOND J. SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Christina Presley brought suit against her municipal employer under 42 U.S.C. §

1983, claiming violations of both the Fourteenth Amendment and 42 U.S.C. § 1981. She

also tacked on a cause of action for employment discrimination under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e. Presley's claims arise out of the Phenix City

Police Department's decision to discipline her for insubordination. This disciplinary

action, in turn, led to her suspension and the loss of her pending promotion to sergeant.

Now the case comes before the Court on the Motion for Summary Judgment (Doc. # 41)

filed by Defendants Phenix City, Lieutenant William Lewis, and Police Chief Raymond

Smith. For the reasons discussed below, the defendants' Motion for Summary Judgment

is due to be DENIED.

1

## II. JURISDICTION AND VENUE

This Court has jurisdiction over Presley's claims under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights). The parties do not claim that the Court lacks personal jurisdiction over them, nor do they dispute that venue is proper under 28 U.S.C. § 1391(b), and the Court finds adequate allegations supporting both.

## III. THE RELEVANT FACTS

### A. Rules, regulations, and policies

The Phenix City Employee Handbook details the City's policies and procedures as they relate to employees. (*See* Doc. # 43-3.) When it comes to personnel decisions, the handbook specifies that the City's Merit System governs. (*Id.* at 4.) This serves a dual purpose: to make sure politics do not interfere with decision making and to ensure employment opportunities are based on merit instead of prohibited traits like race, sex, age, or disability. (*Id.* at 6.)

The handbook also sets out a code of conduct and a disciplinary system for punishing employees who run afoul of the applicable rules. (*Id.* at 12–20.) To this end, Phenix City has set up a three-tiered approach to discipline. (*Id.* at 12.) If an employee commits a Group I offense, he or she receives a written or verbal warning for the first violation followed by progressively harsher discipline for later violations. (*Id.*) Group I offenses include, among others, failing to work overtime, leaving work without permission, and making careless mistakes. (*Id.* at 12–14.) For Group II and Group III

2

offenses, where the first infraction subjects an employee to suspension or discharge, the department has discretion to impose a lesser penalty based on the totality of the circumstances. (*Id.* at 12.) Group II offenses typically call for instruction and a twenty-four hour suspension without pay for the first offense, followed by discharge for any additional violation. (*Id.* at 14.) Group II offenses include, among others, instigating a fight on City property, threatening co-workers, and gambling on the job. (*Id.*)

Group III offenses call for immediate discharge. (*Id.* at 15.) Conduct falling under Group III includes, for example, willful neglect in performing assigned duties, lying to obtain sickness or accident benefits, and, relevant here, insubordination for refusing to perform an assignment or for defying a supervisor. (*Id.* at 15–16.) When the City subjects an employee to disciplinary action, that employee may appeal to the Personnel Review Board. (*Id.* at 18.)

The Phenix City Police Department also has a policy setting forth its chain of command. As it relates to the investigations unit, the chain of command is as follows:

A.    Chief of Police
B.    Assistant Chief of Police
C.    Captain
D.    Lieutenant
E.    Sergeant/Investigator
F.    Corporal/Invesigator
G.    Specialist, I

(Doc. # 57-6.) When an employee has a problem, he or she must "report to the person or position located above their listed position or rank." (*Id.*) The notification procedures go

3

on to state:

> If at any time an employee disagrees with an answer or solution, that employee may appeal that situation to the next higher rank. If any situation where an employee wants to go to the next higher rank or position for a resolution or answer, the employee must make the supervisor aware of that decision. That supervisor should then contact the next supervisor in the chain and make them aware that a particular employee will be contacting them about a problem and that they have been given permission to do so. A mere phone call will be considered to be adequate notification. Employees will not take it upon themselves to notify the next person in the chain. The supervisor from which the problem is being appealed will do that. In the absence of the next person in the chain, an employee may skip that person and proceed to the next higher position in the chain of command.

(*Id.*) The policy allows an officer to go outside the chain of command only in emergency situations, namely when "the answers to the particular problem cannot wait for the proper procedures to be followed." (*Id.*)

Finally, the department has a policy dealing with supervisor accountability for a subordinate's acts. (*See* Doc. # 57-10.) The policy holds supervisory personnel "accountable for the performance of the subordinate personnel under their immediate supervision." (*Id.*) To this end, the department holds supervisors "responsible for all incidents or activities that occur while they are in a supervisory capacity over that particular activity or incident." (*Id.*) The policy limits the supervisor's responsibility for subordinates by absolving the supervisor of liability for situations where the subordinate acts outside of the scope of employment, unless the supervisor orders, approves, or

ratifies the subordinate's act. (*Id.*) By the same token, the subordinate incurs liability for acting outside of the scope of employment unless the supervisor orders, approves, or ratifies the disputed act.

## B. Underlying facts

Christina Presley joined the Phenix City police department as an officer in 1997. (Doc. # 43-6 at 24.) Ten years later, she became an investigator. (*Id.* at 48.) And in 2009, she took the Sergeant Promotional Exam, tying for the highest written score and second highest overall score. (*Id.* at 104–07.) Lieutenant William Lewis—one of the defendants—took notice of her test score and, after a meeting with a six-person committee, recommended Presley for a promotion. (Doc. # 58-1, Ex. 9.) Police Chief Raymond Smith, also a defendant, acted on Lewis's recommendation and promoted Presley to sergeant. (*Id.*) This personnel move was to take effect on September 19, 2009. (Doc. # 43-9 at 194.)

Less than a month before Presley's promotion was to take effect, she and a number of Phenix City police officers responded to a report of an alcohol-fueled altercation between Frank Cobb and Tommy Newsome. (*See, e.g.*, Doc. # 43-6 at 66–74.) Newsome claimed Cobb had cut him with a knife or a box cutter. Cobb admitted as much, but said he only did so after Newsome hit him over the head with a metal chair.

Officers Darrell Lassiter and Algery Hall arrived at Cobb's home first, followed almost immediately by Officer Trent Kilpatrick. (Doc. # 57-26 at 10–13.) When the

5

officers entered the house, they found Cobb, subdued him, and handcuffed him. From there, Lassiter walked Cobb out to his patrol car while Kilpatrick and Hall looked for a weapon. As Lassiter sat Cobb down in the patrol car, Cobb said, "yeah, I cut him. He was trying to take my head off." (Doc. # 57-26 at 16.) Shortly after Lassiter put Cobb in his patrol car Presley arrived. (*Id.* at 16, 18.) She stayed by Lassiter's car while Lassiter went in to help Hall and Kilpatrick look for the weapon. (*Id.* at 18–19.) At some point, Lassiter had to take another call, so he and Kilpatrick transferred Cobb to Kilpatrick's car. (*Id.* at 21.) Lassiter then left the scene. (*Id.*)

A number of members of the Criminal Investigations Division (CID), the group to which Presley belonged, also responded. (Doc. # 43-6 at 66.) This group included Lieutenant Lewis, Sergeant James Langley, and Corporal Jay Brice. (*Id.*) Upon their arrival, Lewis and Brice began searching for the weapon used by Cobb while Langley photographed the scene. (Doc. # 43-8 at 37–40.) Lewis testified during his deposition that he spoke with Cobb sometime while Cobb was in one of the patrol cars and that Cobb said, "yeah, I cut him, I tried to cut his damn head off." (*Id.* at 41.) But Lewis did not include this statement by Cobb in his initial report about the incident. In fact, he waited until three weeks after the incident—well after Presley had been disciplined—to file a supplemental report describing what Cobb supposedly said to him. (*Id.* at 84.) During his deposition, Lewis could not recall whether another officer was near him at the time (*id.* at 41), and no other deponent corroborated Lewis's story.

6

After he allegedly spoke with Cobb, Lewis, along with Brice, left to speak with Newsome at the hospital.[1] Upon speaking with a very intoxicated Mr. Newsome, they left to return to the Phenix City police department. (Doc. # 57-2 at 36.) In the meantime, Presley—whom Lewis had appointed to lead the investigation—stayed at the scene and spoke with Charles Jackson, a witness to the Cobb/Newsome fight. Jackson told Presley, "Tommy [Newsome] ran up to Jerome [Cobb] with that chair and swung it at Jerome, next thing I knew both Jerome and Tommy were on the ground and Tommy started yelling 'I'm cut.'" (Doc. # 43-6 at 76.) Eventually Presley left the scene to regroup with her fellow investigators at headquarters.

When everyone had made their way back to the police department, Lieutenant Lewis told Presley that "Cobb needs to go to jail," and Presley knew this order meant that she had to arrest and detain Cobb. (Doc. # 43-6 at 84, 186, 187.) Still she persisted in her conversation with Lewis, attempting to tell him about additional information she gained which suggested that Cobb acted in self defense. (*Id.* at 187.) But Lewis shut down this line of conversation and told Presley, Langley, and Brice that Cobb needed to go to jail. (*Id.*) He then left without hearing about the facts she gathered while he was questioning Newsome at the hospital. (*Id.* at 87, 187.)

Presley, worried that the officers lacked probable cause to keep Cobb in jail, called

---

[1] Lewis testified that he and Brice returned to the police department briefly before going to pay Newsome a visit in the hospital. No other witness corroborated this version of the events, but either way, the timing seems insignificant as it relates to the issues now before the Court.

Sidney Landreau, the Assistant District Attorney. She gave Landreau her version of the facts, including the statements by Jackson that Lewis refused to hear. Landreau responded by telling her the case should go to the Grand Jury. (Docs. # 43-6 at 189; # 57-3 at 14–15.) Presley then released Cobb, even though she did not try to call Lewis first and despite protestations by Langley.[2] She testified during her deposition that she did so because she felt her oath as a police officer imposed upon her an ethical and moral duty to uphold the law. (Doc. # 43-6 at 83.) Chief Smith, when deposed, testified that an officer faced with a Catch-22—like a situation where she has to ignore a direct order or commit a constitutional violation—should uphold the law over the chain of command. (Doc. # 43-9 at 90.)  Captain Phyllis Pendleton testified similarly, and department policy makes it an offense warranting termination to make an knowingly unlawful arrest.

Lewis came back to work on Monday to find out that Presley had released Cobb. (Doc. # 43-6 at 97.) In a meeting in which both Brice and Langley attended, he asked Presley what happened to Cobb. (*Id.*) After she replied that she had decided not to arrest him, Lewis sent Langley and Brice from the room, shut the door, and told Presley that he wanted her gun and badge. (*Id.* at 98.) Lewis assigned Brice as lead investigator on the Cobb case, and then he went to Chief Smith's office to inform him of Presley's insubordination. (Doc. # 57-3 at 12.)

Chief Smith decided to punish Presley under the department's Merit System.

---

[2] Langley told Presley that Lewis wanted Cobb arrested, telling her, "if you don't arrest him come Monday we will all catch hell." (Doc. # 43-6 at 92.)

Presley's insubordination could have led to her firing, but Smith settled on a forty-hour suspension, without pay, plus twelve months probation. (*See, e.g.*, Doc. # 43-6 at 98.) This disciplinary action caused Presley to lose her scheduled promotion to sergeant and made her ineligible for a promotion for twelve months. (*Id.*) Chief Smith disciplined neither Langley nor Brice. Notably, the grand jury that later heard Cobb's case returned a no bill, meaning it found insufficient probable cause to indict Cobb, hence confirming the correctness of Landreau's advice and Presley's decision to follow it.

Presley appealed Smith's disciplinary decision, bringing her claim before the Personnel Review Board of the City of Phenix City. The board upheld her discipline. After going through the proper bureaucratic channels, she brought suit against her current[3] employer for sex discrimination.

## IV. LEGAL STANDARD

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court should grant summary judgment when the pleadings and supporting materials show that no genuine issue exists as to any material fact and that the moving party deserves judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "always bears the initial responsibility of informing

---

[3] Presley still works at the Phenix City Police Department, now as a corporal in the patrol division.

the district court of the basis for its motion, and identifying" the relevant documents that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To shoulder this burden, the moving party can present evidence to this effect. *Id.* at 322–23. Or it can show that the nonmoving party has failed to present evidence in support of some element of its case on which it ultimately bears the burden of proof. *Id.*

If the moving party meets its burden, the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995). And a genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in his or her favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Thus, summary judgment requires the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Indeed, a plaintiff must present evidence demonstrating that he can establish the basic elements of his claim, *Celotex,* 477 U.S. at 322, because "conclusory allegations without specific supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the non-movant's evidence. *Anderson*, 477 U.S. at 255. It also must draw all justifiable inferences from the

10

evidence in the nonmoving party's favor. *Id.* After the nonmoving party has responded to the motion, the court must grant summary judgment if there exists no genuine issue of material fact and the moving party deserves judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## V. DISCUSSION

Title VII bars employers from discriminating against an employee in the "terms, conditions, or privileges of employment" because of the employee's sex. 42 U.S.C. § 2000e-2(a)(1). To prove such claims without direct evidence,[4] a plaintiff must rely on the burden shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* approach, a plaintiff must state a facial case before the burden shifts to the defendant. 411 U.S. at 802. This initial burden "is not onerous; it requires only that the [p]laintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff bears her initial burden, a presumption arises that the defendant impermissibly discriminated, and the defendant then has to articulate a legitimate, non-discriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802. "This intermediate burden is 'exceedingly light.'" *Holifield*, 115 F.3d at 1564 (quoting *Turnes*

---

[4] Direct evidence of discrimination is "defined . . . as evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Damon v. Flemings Supermkts. of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotations omitted). More simply, direct evidence consists of "only the most blatant remarks, whose intent could be nothing other than to discriminate." *Id.* at 1359. Here, Presley presents no direct evidence of discrimination.

*v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994)). If the defendant bears this burden, it negates the plaintiff's facial case, and the plaintiff must then come forward with sufficient evidence for a fact finder to conclude that the employer's proffered reason served as pretext to conceal an impermissible motive. *McDonnell Douglas*, 411 U.S. at 804; *Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 796 (11th Cir. 1988). So "once the employer succeeds in carrying its intermediate burden of production, the ultimate issue . . . becomes whether the plaintiff has proven that the employer intentionally discriminated against [her] because of" her sex. *See Turnes*, 36 F.3d at 1061.

### A. Presley's facial case of sex discrimination

A prima facie case of sex discrimination for failure to promote has four elements. The plaintiff must show that she (1) belongs to a protected class, (2) applied for a promotion for which she was qualified, (3) was rejected despite her qualifications, and (4) was passed over in favor of an equally or less-qualified employee outside of her protected class. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010). A prima facie case of sex discrimination for disparate disciplinary action shares the first two elements of a failure to promote claim. The final two elements, however, require a plaintiff to show she suffered an adverse employment action and was either replaced by a male or treated less favorably than a similarly-situated male. *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1298 (11th Cir. 2003).

Presley brings two claims—one for failure to promote, the other for being

12

disciplined while similarly situated males were not. On both claims, the parties agree that Presley, a female, belongs to a protected class. On her failure to promote claim, Presley has shown that she made one of the highest scores on the sergeant's exam and that she had above-average performance reviews. Thus she had the requisite qualifications; indeed, the defendants tentatively promoted her. On the third element, the parties agree that her promotion never took effect, meaning the department rejected her despite her qualifications. On the final element, neither party disputes that after the department rescinded her promotion, they awarded the sergeant position previously reserved for Presley to Steven Zdanowicz, a male. (Doc. # 43-9 at 189.) Presley has therefore made out a prima facie case of sex discrimination as it relates to her failure to promote claim.[5]

On her discipline claim, Presley satisfies the first two elements easily: she belongs to a protected class (female) and she had the relevant qualifications (high score on the sergeant's exam and solid performance reviews). As for the third, she suffered an adverse employment action when the department suspended her for forty hours and rescinded her promotion, but not necessarily when they took her off of the Cobb case as lead investigator.

On the final element, Presley offers up Corporal Jay Brice as a comparator. Presley points out how Lewis replaced her with Brice as lead investigator on the Cobb

---

[5] The defendants focus their argument almost solely on what they perceive is Presley's failure to state a prima facie case. This is largely due to a misunderstanding on their part about how *McDonnell Douglas* works as they base most of their arguments on the effect of her insubordination.

13

investigation after she released Cobb from custody. And she notes that she was the only one punished for Cobb's release even though both Brice and Langley agreed with her about calling the assistant district attorney and despite both men having heard Lewis tell Presley that Cobb needed to go to jail.

Presley's argument that Brice replacing her as lead investigator amounts to an adverse employment action is unavailing. When it comes to selecting lead investigators, the Phenix City Police Department picks members of their investigations unit to serve in that role on a rotating basis. Lead investigators do not get paid more, do not have special privileges, and do not receive any material benefit from heading up any given investigation. As a result, the decision to take her out of that role does not amount to an adverse employment action. *Cf. Belt v. Ala. Historical Comm'n*, 181 F. App'x 763, 765 (11th Cir. 2006) (". . . her job title, salary, work hours, and benefits did not change. We therefore conclude that Belt has suffered no tangible harm through a serious and material change in the terms, conditions, or privileges of employment.") (citation omitted). Because only her suspension and the recision of her promotion meet the adverse employment action requirement, she needs to use a comparator who received neither punishment despite being insubordinate or violating a similar work rule.

That leaves Presley with her argument that similarly situated men—namely Langley and Brice—received more favorable treatment. For other employees to qualify as comparators, a plaintiff "must show that the 'employees are similarly situated in *all*

14

*relevant aspects.*'" *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam) (quoting *Holifield*, 115 F.3d at 1562) (emphasis added). "In evaluating the similarity of the comparators identified by the plaintiff, the most important variables . . . are the nature of the offenses committed and the nature of the punishments imposed." *Summers v. City of Dothan*, 757 F. Supp. 2d 1184, 1204 (M.D. Ala. 2010) (citation omitted). Both the quantity and quality of the comparator's misconduct must be nearly identical. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

Presley argues that, because both Brice and Langley heard Lewis announce that Cobb needed to go to jail, and since both men agreed with her decision to call Landreau, they were treated more favorably when the department decided not to punish them. She further contends that Sergeant Langley had supervisory authority on the night of the Cobb incident because he had a higher rank. From there, she notes that the Department's Standard Operating Procedures establish that "[a]ll supervisors will be held responsible for all incidents or activities that occur while they are in a supervisory capacity over that particular activity or incident." (Doc. # 57-10.)

Presley's argument is persuasive. During his deposition, Chief Smith testified:

> I have always been instructed that even as a sergeant in CID, if I were to observe a problem or something that was going to cause an issue with the department outside of my scope of responsibility, particularly with a less-ranked person in the department, then I was obligated to step in and take control of the situation.

(Doc. # 43-9 at 34.) Based on Smith's testimony, it is clear that a higher-ranked officer

who ratifies or approves a subordinate's inappropriate conduct shares in the responsibility for it. Furthermore, the department's written chain of command for investigations lists "Sergeant/Investigator" above "Corporal/Investigator." This suggests that the "lead investigator" label does not elevate a corporal above a sergeant. So despite Presley's role as lead investigator, it appears that Langley had a duty to step in and ensure her compliance with Lewis's orders. The Court cannot say that there is no genuine issue of material fact regarding whether his failure to do so makes him at least as culpable and therefore as deserving of punishment as Presley. Accordingly, Presley has stated a prima facie case of discrimination as it relates to her discipline.

## B. The defendants' legitimate, non-discriminatory reason

After the plaintiff makes out a prima facie case, the burden shifts to the defendant to give a legitimate, non-discriminatory reason for the challenged action. To satisfy the burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* at 257.

Phenix City has put forward ample evidence tending to show it had a legitimate,

16

non-discriminatory reason for its actions. For example, Presley testified that Lewis told her to keep Cobb in custody, and she does not dispute Lewis's superior position in the chain of command. Therefore, Presley's insubordination and failure to follow the chain of command gave the City a legitimate, non-discriminatory reason for disciplining her and rescinding her promotion.

### C. Pretext

After the employer gives a legitimate, non-discriminatory reason for the challenged action, "the plaintiff must introduce significantly probative evidence that the asserted reason is merely a pretext for discrimination." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006). A plaintiff may show pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reason, *id.* at 1163, or by producing other evidence "which permits the jury to reasonably disbelieve the employer's proffered reason," *Steger v. General Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003). "Any believable evidence which demonstrates a genuine issue of material fact regarding the truth of the employer's explanation may sustain the employee's burden of proof." *Steger*, 318 F.3d at 1079.

Presley has met her burden. First, the evidence shows that the department disciplined Presley—but not the two male investigators—for insubordination.[6] Yet all

---

[6] *Cf. Entrekin v. City of Panama City*, 376 F. App'x 987 (11th Cir. 2010) (finding pretext evidence lacking when facts showed that plaintiff's punishment for insubordination comported with

three heard Lewis's order. Thus, a reasonable jury could look at the policy and conclude

that Langley and Brice deserved punishment too. And even assuming that the lead

investigator's position shields investigators with the same rank from responsibility, which

would take Brice out of the equation, Langley held a higher rank than Presley and the

department's policy holds superior officers responsible for the acts of their inferiors. (*See*

Doc. # 57-10.) This gives the jury another route for inferring pretext.

Furthermore, the defendants' claim that department policy puts a lower-ranked

lead investigator above a higher-ranked investigator would not preclude a reasonable

juror from finding this argument self-serving and pretextual. Indeed, the department says

it disciplined Presley for sidestepping the chain of command by calling Landreau—yet it

tries to ignore the very same command protocol when justifying its failure to discipline

Langley.[7] In addition, Presley testified that Sergeant Langley told her to call the district

attorney's office (Doc. # 43-6 at 91), which suggests Langley participated in the decision

to cut Cobb loose.[8] At a bare minimum, the defendants have admitted that a genuine issue

---

usual punishment for insubordinate police officers).

[7] The defendants argue that the lead investigator answers directly to the lieutenant supervisor. Chief Smith testified that this is the department's practice. If accepted as true, this would mean that Presley had to report to Lewis, not Langley, on the night in question—even after Lewis left and despite Langley having a higher rank. This is by no means a meritless argument, particularly in light of Chief Smith's explanation of department custom. But it is not one that the Court can accept when the department's written chain of command contradicts the customary practice.

[8] Presley also testified that, after Lewis left, she considered Langley her supervisor on the night of the Cobb incident. (Doc. # 43-6 at 191.) Langley similarly, if not identically, testified that he considered himself the "sergeant on the floor" after Lewis departed for the night. (Doc. # 57-4 at 13, 61.)

of material fact exists by relying on the chain of command in one situation while ignoring it in another. Lewis, moreover, testified that he "told Corporal Presley—and probably Sergeant Langley also—to put Mr. Cobb in the interview room, take his statement, and go ahead and process him." (Doc. # 43-8 at 57.) This testimony creates a genuine issue of material fact, because Lewis's order that Presley disregarded potentially applied to Langley as well, thus suggesting that he deserved to be punished alongside Presley.

Second, Chief Smith admitted in his deposition that Presley followed procedure by calling Landreu for advice. (*See* Doc. # 43-9 at 99–100.) In fact, Smith stated that he taught officers to refrain from making unlawful arrests,[9] which, as Presley notes, undermines his rationale for disciplining her and discredits his claim that he punished her for insubordination. What is more, Chief Smith failed to take disciplinary action against Lewis or Brice when they failed to arrest Newsome after their trip to interview him at the hospital. Although neither man had an order from a superior officer to arrest Newsome, the department's decision to punish Presley for releasing an innocent man, while not

---

[9] Smith testified during his deposition as follows:

     Q.    Now you would agree with me that an officer should not make a decision to wrongfully arrest somebody?

     A.    That's true.

     Q.    Even if their supervisor tells them to—

     A.    Yes.

     Q.    —they should not wrongfully arrest somebody?

     A.    That's true.

     Q.    If the officer has a sincerely-held belief that the arrest is wrong, they should not make that arrest?

     A.    Yes.

(Doc. # 43-9 at 71.)

addressing Lewis or Brice's decision to let the aggressor Newsome go, would allow a reasonable jury to infer that something is amiss about how the department treated Presley. In other words, the department's preoccupation with punishing Presley for making the right decision, combined with its ambivalence regarding the failure to arrest Newsome, supports an inference of discriminatory animus towards Presley.

Third, Presley produced evidence that Lewis lied about key facts surrounding the Cobb/Newsome incident. No other officer heard Cobb say "I was trying to cut [Newsome's] damn head off." The timing of Lewis's decision to supplement his report—three weeks after the incident occurred and after Presley had received her punishment—raises further suspicions. According to Presley, Lewis massaged the statement contained in Lassiter's report to make it appear that he had more information than she did when he told her to arrest Cobb. Based on the timing of Lewis's supplemental report, his incentive to bolster his justification for disciplining Presley, and the lack of testimony from other officers about whether Cobb made those statements to, a reasonable jury could infer pretext by discounting his claim that he punished Presley for insubordination.

Relatedly, Presley put forth evidence showing that Lewis knew she acted appropriately by calling Landreau for legal advice. Because Lewis listed Presley's call to Landreau as one of the reasons for disciplining her, yet later admitted that she acted properly, a reasonable person could infer that he used Presley's supposed infidelity to the

20

chain of command as pretext. *Cf. Schoenfeld v. Babbitt*, 168 F.3d 1257, 1269 (11th Cir.

1999) (". . . disbelief of the reasons put forward by the defendant (particularly if disbelief

is accompanied by a suspicion of mendacity) may, together with the elements of a prima

facie case, suffice to show intentional discrimination." (quoting *St. Mary's Honor Ctr. v.

Hicks*, 509 U.S. 502, 511 (1993))).

Fourth and finally, Captain Phyllis Pendleton testified that she believes the

department disciplined Presley because she did not belong to the "good old boy" network

within the department. (Doc. # 57-5 at 28.) To support this claim, she recounted an

instance where she tried to correct a misstatement made by Lewis. Her attempted

correction caused Lewis to cut her off, and he refused to hear what she had to say before

telling her, "I'm done with the briefing, you can get out on the street." (Doc. # 57-5 at

44.) After the incident, Pendleton heard that Lewis criticized her for following his

directions based on the erroneous briefing and that he had used the word "bitch" when

referring to her.[10] (*Id.* at 45.) She also related how Lewis used to make frequent and

arguably sexist statements about Frankie Deer, a female and former lieutenant.

Generally speaking, "me too" evidence is admissible to prove discriminatory

intent. *Goldsmith v. Bagby Elevator*, 513 F.3d 1261, 1286 (11th Cir. 2008). Typically the

evidence has to relate to the same supervisor, *see id.*, and here it does: Pendleton

---

[10] Lewis denied making this statement during his deposition. (Doc. # 43-8 at 114.) Given the case's posture—a motion for summary judgment—the Court has to look at all disputes about the facts in Presley's favor. So the Court has credited Pendleton's testimony over Lewis's.

complained about Lewis's bias against women just as Presley has. Indeed, the two women

had similar complaints about Lewis. Presley said that he "shut her down" when she tried

to tell him about the evidence she had supporting Cobb's self defense claim. And

Pendleton likewise testified that Lewis cut her off and ignored her when she tried to

correct a misstatement he made. The main difference is that Lewis's decision to ignore

Pendleton had no further consequences for Pendleton whereas it put Presley in a position

where she had to make a wrongful arrest or commit an act of insubordination. Either way,

Pendleton's testimony has a bearing on Lewis' motive and credibility—both

considerations properly reserved for the jury—so it too supports the Court's decision to

deny summary judgment.

At bottom, the comparator evidence put forth by Presley, combined with the

arguable inconsistencies in Smith and Lewis's words and actions, provide a "mosaic of

circumstantial evidence that would allow a jury to infer intentional discrimination." *Smith*

*v. Lockheed Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011). Summary judgment is

therefore inappropriate. Consequently, the defendants' motion is due to be denied.

## VI. CONCLUSION

It is hereby ORDERED that the defendants' Motion for Summary Judgment (Doc.

# 41) is DENIED.

Done this the 5th day of March, 2012.

/s/ Mark E. Fuller
_____
UNITED STATES DISTRICT JUDGE

22